## The Heirs of Bartram Galbraith *against* Detrich.

The opinion of the Court was delivered by
KENNEDY, J.—All the questions and points raised and made in this case, have been considered and decided in the preceding case of the same plaintiffs in error against Elder, which renders it unnecessary to travel over the same ground a second time.

. The judgment of the court below is reversed, and a *venire de novo* awarded.


HUSTON, J. dissenting.—The suit was brought after a decision of the board of property, on the idea that the case was within the 11th section of the act of 1792. As I understand it, it is the opinion of the whole court that section does not apply to or affect this case; but I leave this to a subsequent part of this opinion. The cause was both in common pleas and here argued on all the points, and we have thought it best to give an opinion on the whole case.

As I think the cause will be better understood in that way, I shall first state the title of Galbraith's heirs, and then that of F. Elder.

On the 29th of January 1794, a list of applications for warrants, forty of which the defendants below claim, was filed in the office of the secretary of the land office. This list was proved to be in the handwriting of Bartram Galbraith, deceased. On the back of it was written "Bartram Galbraith to pay." This endorsement was

[Galbraith v. Detrich.]

not in Mr Galbraith's handwriting, but of a clerk to the secretary of the land office.

Defendant also produced the forty warrants claimed by them, beginning with John Smith, and ending with Jacob Shueman; on these was endorsed "Executed June 1795:" "returned." This was in the handwriting of B. Galbraith, who was then the deputy surveyor of Dauphin county.

It was proved that these warrants had been in the office of different deputy surveyors, who succeeded B. Galbraith; that in 1815, they were in the possession of Thomas Elder, who gave them to Wm Galbraith, a son of Bartram, and took his receipt for such delivery. Wm Galbraith gave them to J. Smith, then deputy surveyor, who endorsed the time he received them—11th Feb. 1815.

The defendants below then offered a general draft of these forty warrants, and many others, in the handwriting of Bartram Galbraith, and Bartram Galbraith's book, containing the field notes of work done by him on laying these and other warrants; it is entitled: "Note book of a large survey made for sundry gentlemen in Dauphin county; entered on the business on the 4th of June 1795."

Bartram Galbraith was appointed deputy surveyor of that part of Dauphin county, in which the lands in question lay, on 8th Nov. 1791.—B. Galbraith died 9th March 1804.

The names of different deputy surveyors who succeeded B. Galbraith were given—John Davies proved he had these forty warrants as deputy surveyor in 1823.

7th April 1794.—73 warrants and returns of survey thereon, were then given in evidence, called the Hiester warrants; these returned on 9th Oct. 1791, by Levi G. Hollingsworth. From this it appears that Galbraith had ceased to be deputy surveyor.

Also, sixteen warrants, beginning with William Ayres.

Also, thirteen warrants, beginning with James Ross; date 14th Aug. 1794.

Also, ten warrants, beginning with James Ross; date 1st Sept. 1794.

Also, twenty-one warrants, beginning with J. Ross, and ending with David Witmer; date 1st Sept. 1714.

Then examined several witnesses as to lines on the ground, and proved that the line bounding these forty warrants on the north were found on the ground, according to B. Galbraith's field notes. These field notes went no further, and no other lines found; but the waters were laid down correctly; and witnesses believed that other lines must have been run. Defendants then proposed to show that James Wilson on the 5th of Aug. 1794, mortgaged the seventy-three Hiester warrants and other lands, in other counties, that this mortgage was sued in Dauphin county, and the lands sold; this to show that James Wilson did not then claim the forty warrants in question; objected to and rejected, because it has no tendency to prove any such

VIII.—K

[Galbraith v. Detrich.]

thing, especially as the forty warrants had no existence till after the date of this mortgage—no error in this.

.. The defendants showed from the books called John Kebler's blotters, that, on the 10th of September 1794, James Wilson deposited with the receiver-general of the land office 21,000 dollars, to be applied to pay for lands entered by the judge; and that part of this money was, on the 3d of January 1795, applied to pay for the forty warrants now claimed by defendants; that about that date, and not before, these forty warrants were made out, though dated on the day the appli ations were filed.

. The deposition of John Foster was then read.

Defendants then proved that T. Smith, at that time deputy-surveyor, employed hands to make a re-survey of these forty warrants, but quit after surveying two tracts, and told the hands the Galbraiths would not have the lands run out; that they were not taxed, and if they had them run out now, they would be taxed. This was in the spring of 1816.

. They then showed, that, on the 2d of August 1816, F. R. Shunk and Thomas Elder, each made application for a tract of 400 acres, in the forks of Rattling Creek. And on the 21st of August 1816, John H. Candor and John McMichael, each applied for 400 acres. On the 9th of August 1816, William B. Galbraith entered *caveats* against them.

. On the same 9th of August 1816, W. B. Galbraith for the heirs of Bartram Galbraith, petitioned the board of property to receive the returns of survey of these forty warrants, as made out by Bartram Galbraith. This was refused, because the field ~~back~~ of B. Galbraith showed only part of the lines of a large body of surveys made for sundry gentlemen in Dauphin county, but nothing showing the work was done for these or any particular warrants, and because the then deputy-surveyor stated, that no lines except those in the field book could be found.

On the 3d of September 1816, William B. Galbraith presented a petition for a re-survey, and was heard by W. A. Hopkins, his counsel.

This was also refused, because the warrants, although dated the 29th of January 1794, did not actually issue until the 3d of January 1795, when the money was paid to the receiver-general, which was expressly contrary to the act of the 22d of September 1794.

. A petition was presented for a re-hearing, and on the 30th of December 1816, the former decree was affirmed. I may recur to this again. In March 1831, another petition was presented by Jane Elder, S. Morris, and H. Carpenter, and on the 24th of March, an order was made to the deputy-surveyor to go on the ground and trace the lines, and make return without delay.

- On the 4th of June 1831, *caveats* had been entered by S. Sallade, T. Elder, and ten others. The *caveators* appeared by counsel, and Messrs G. Fisher and J. A. Fisher, for the heirs of Galbraith, named

in this suit. The attorney of the Galbraiths filed a release of all the lands claimed by John Sharpe, Daniel Sharpe, George Sharpe, John Stack, John Jared, Richard Kelly's heirs. That is, as I understand it, a release of all claim to any warrants and surveys interfering with those forty warrants claimed by them, except such as were owned by Mr Elder. Here the decision was in favor of Galbraith's heirs, which led to this suit.

There was also some evidence of lands being sold in 1834, for taxes, and bought by T. Elder; to show that he suffered his own lands to be sold for taxes, and purchased them himself. And some evidence was offered that Mr Carpenter offered to redeem them, and this was rejected by the court as irrelevant. Although the paper book is among the most voluminous, and contains much offered and some rejected, of which I can not see the object, yet in some places it is so brief, that I am not sure I have understood it. As this court has decided that a man can not acquire a title to lands to which he had no title, by simply paying the taxes, so I suppose a man, if he has a good title, does not lose it by suffering his lands to be sold for taxes, and buying them in.

The deposition of Bird Wilson, taken on commission, and the deposition of J. Watson were offered, excepted to, and received. The deposition of Bird Wilson referred to, and proved the execution of an article of agreement between James Wilson and James Ross, (of Lancaster.) This article of agreement was returned enclosed with the commission. The article of agreement was as follows:—

Articles of agreement indented made the eighth day of September in the year of our Lord one thousand seven hundred and ninety-four, between James Ross of the county of Lancaster and state of Pennsylvania, Esquire, of the one part, and James Wilson, of the city of Philadelphia, Esquire, of the other part. Whereas, the said James Ross hath entered in the land office of Pennsylvania, applications for two hundred and five tracts of unlocated land, each for four hundred acres, in Dauphin county, containing in the whole eighty-two thousand acres, in the names of the following persons, to wit: John Ayres *et al.*, and the warrants being now issued, or about to be issued, for surveying the same, all which lands the said James Ross hath bargained and sold to the said James Wilson on the following terms: That he, the said James Ross, shall and will on or before the first day of February next, at his own expense procure from the several persons aforesaid, whose names have been made use of in the said warrants, deeds for all the said lands to the said James Wilson in fee. And also survey or cause to be surveyed, the said lands, and after the said lands shall be so surveyed, have the same returned to the surveyor-general's office and patented to the said James Wilson in fee simple. In consideration whereof, the said James Wilson doth hereby covenant, promise, and agree to pay or cause to be paid, the purchase-money to the state and office fees for the said tracts, and when the returns of survey are all made to the

[Galbraith v. Detrich.]

.surveyor-general's office clear of disputes and ready for patenting, then the said James Wilson shall and will advance all the survey-ing and patenting fees. And .after all. the said patents are obtained .in. manner .aforesaid, and legally recorded in . the Rolls. office, then .he, the said James Wilson shall and will further. pay or cause to be .paid to the said James Ross, one shilling Pennsylvania currency, per acre, for the said land, excluding the allowance of six per cent. .for roads to be ascertained and fixed by . the patents and surveys. :And for the true. performance of all. the covenants and. agreements .aforesaid,. the said parties do mutually bind themselves, their executors, and administrators, each to the other of :them in the penal .sum of ten thousand pounds.

In witness whereof, the said parties have interchangably set their hands. and :seals hereunto,. dated the day and year above written. .

                        .JAMES .ROSS,     [L.. S.]
                        JAMES .WILSON, [L.. S.]
:Sealed and delivered in the presence of HANSEL CAMBAL.

Also a deposition of John Watson was. offered. and received, to which was annexed a copy of the .above .agreement, on the. back .of .which was an endorsement in the handwriting of Bartram. Galbraith; this to show that he knew of said agreement.

.The endorsement was, " Copy of .an article. of agreement, James Ross and James Wilson, Esqrs." · This, as I understand it, was in .Bartram Galbraith's handwriting. Below this endorsement, near the bottom, was.written, " Josiah Galbraith. .Jan. 18th,.1796."

This was suggested to .have. been the paper found among. the papers seen by. John Foster among those of B. Galbraith, and among those to which he says .T. Elder had access. To the receiving this .a bill of exceptions was taken. The. defendants produced deed rolls from persons of the names of the warrantees, dated at different times, from 1815 to.1832.

· The counsel of .T. Elder then showed twelve warrants to Tho-:mas Elder and one or two others. .The first dated on the 6th of .March 1827, and the others between that date and December 29, .1829, each of which was surveyed and retained .within a few months after its date, and on all of which patents issued to Thomas .Elder in the early part of .1830. They also read the record of a .petition. by David Elder, a son-in-law of B. Galbraith deceased, and :brother of T. Elder, praying for a partition or :valuation of that part of the real estate of Bartram Galbraith which lay in Dauphin county, and proceedings thereon by inquest, execution and. award of lands to .D. Elder. These proceedings began in May and ended :in December 1806—only about a dozen tracts were specified therein, and those totally different from the lands now in dispute. Those proceedings contained no reference or. allusion to .these forty warrants now claimed. They also showed the record of the application of William B. Galbraith under the insolvent. laws in 1826 and .1827,

to show that he did not return his interest in these forty warrants as part of his estate.

They also read the act of the 17th of April 1795, for raising county rates and levies, directing deputy surveyors to return to the commissioners a list of all surveys made and names of warrantees to be taxed in name of warrantees, until commissioners are informed to whom they belong. As B. Galbraith's return on this law they showed several sheets of paper containing a list of surveys made by B. Galbraith, all in his handwriting. Across the forty in question was written " warrants delivered to me by James Ross;" and so designating the persons from whom he received each parcel of warrants. At the bottom was written by him as follows: " Foregoing in the townships of Upper and Middle Paxton. A general survey of the whole has been made, *but no estimate of quantity generally or specifically, for want of fees;* and no doubt the whole of the parties contend with each other." This was proved to be an office paper from commissioner's office, and was dated June 1798.

As I understand this cause, it is not intended by the counsel of the Galbraiths that their claim would be available against any other than T. Elder; their claim is abandoned against all others. Their allegation is that Mr Elder was at one time their counsel, and as such acquired some information which might have been of advantage to them, but which he unfairly used to defeat their titles or conceal from them, and used for his own benefit; and that, therefore, he cannot hold against them.

This by the court below was divided into two questions; First, had Bartram Galbraith any right to these lands? The whole claim of his heirs is founded on the fact that the list containing these applications filed in the land office is in his handwriting. I contend that on principle and authority this gave no title.

Since 1784 no warrant could issue until the purchase-money was paid. After the act of the 3d of April 1792, there were persons anxious to buy the unimproved lands. These persons principally resided in the cities and counties at the east end of the state, and perhaps no one of them had any personal knowledge of the unsold lands of the commonwealth. People from the country who had such knowledge flocked to Philadelphia in the winters of 1792–3, and of 1793–4. These were men who were or had been deputy surveyors, or their assistants, hunters, woodsmen, &c. It had been customary to enter the application for a warrant while single tracts were taken, and there were four or five offices, each part of the land offices in different parts of the city, (as was always the case while the offices were in Philadelphia,) and to proceed through the different offices and get the warrant out two or three days after; sometimes ten days after; though it was always dated as of the day the application was filed. And after 1792, when warrants were taken out by tens and twenties and fifties and hundreds,

VIII.—K*

the discoveror filed his list of applications and looked round for a purchaser to pay for them to the state, and who also paid or contracted to pay something to the discoveror—but no title to the land was passed, or was supposed to pass, until the purchase-money was paid to the state. It sometimes happened that months and even years elapsed after filing the applications before the money was paid into the office on them. And in taking up large bodies of land there turned out to be extensive interferences, and the title was uniformly held to vest first in him who first paid the state. See Grant's Lessee *v.* Eddy, 2 *Yeates* 148. In this cause the real plaintiff was John Nicholson to whom Grant had agreed to sell, and the real defendant was James Wilson to whom Mr Hollinback had agreed to sell. The ablest counsel in the state were employed. I took a very full note of the case and the opinion of the court. On the above and on some other points it was to have been argued in bank, but were never stirred there that I could learn—and the law as above laid down has not, to my knowledge, been contested before this case—and on it the practice of the land office, as proved by Mr Henderson, the deputy secretary, has been and is founded. Under the proprietory government from the 1st of August 1766 till the 1st of September 1769, a location or application was the inception of a title, but one on which no money was paid. We have several cases in which the contest was whether plaintiff or defendant entered the application. Ewing *v.* Barton, 2 *Yeates* 378; Simpson *v.* Williams, 2 *Yeates* 402; Scott *v.* Leather, 3 *Yeates* 184. In all these cases the person who expended money in procuring and paying for the survey held the land. In the first two the person who wrote and entered the application failed. In the last the person who entered the application also procured and paid for the survey and recovered against an innocent and *bona fide* purchaser from the person whose name was used in the application. This last point seems a little inconsistent with some other decisions, and perhaps under other circumstances may be worthy of reconsideration, but these cases show that even where no money was paid before taking the order, the fact of having written the application alone, was counterbalanced by the payment of money or expenditure of labour. But where, by the regulations of the proprietors or by act of assembly, it was necessary that the purchase-money should be paid before the warrant could issue, I have never before known or heard that any person could set up title against him who paid the money, by alleging that the applications for the warrants were written by him, and not by the person who paid the money.

The fact that the applications for warrants were received and filed where no money was paid, is recognised by the act of the 22d of April 1794, which directs that no warrants shall thereafter issue, on any application then filed for lands over the Allegheny river, unless the purchase-money shall be paid before or on the 15th of June then next; now besides recognising the practice, this act is predi-

[Galbraith v. Detrich.]

cated on the ground that the application gives no right until the money is paid.

The act of the 22d of Sept. 1794, provides "that all applications made since the 1st of April 1784, on the files of the books of the land office, for lands within this commonwealth, for which the purchase-money has not been paid, shall, from and after the passing of this act, be null and void." Now, if the writing and procuring to be filed in the land office applications for warrants gave any kind of right to the applicant before paying the price to the state, this law would have been unconstitutional and void. Nobody ever thought it liable to this objection. It is, however, a legislative recognition of the practice of filing applications before money paid, and a legislative declaration that such writing and filing gave no title. The payment of the purchase-money to the state, and that only, gave the right.

There was often difficulty in proving who actually paid the money on a warrant, or a series of warrants. Sometimes the person who paid took a receipt for so much paid on a particular warrant or warrants, and this receipt was always evidence of ownership, and often passed with the title papers, and supplied the place of a deed poll from the warrantee. Every old lawyer in the middle and western counties has seen such receipts by Edward Physic, receiver-general, under the proprietors, and Francis Johnson or John Keble for Francis Johnson, from 1784 to 1794; some of our reported cases recognise them. John Keble was chief clerk in the receiver-general's office, from 1784 until after 1794. He had, while he lived, and left, when he died, a character of great weight, for honesty and accuracy. He kept a blotter, or day book, containing an exact account of all moneys received, from whom received, and to what applied. These were left in the office, are still there, and designated as John Keble's blotters. They are unbound books (though they ought to be bound). From these, the ledgers, or large bound books, were made up; but I know not why, in these large books, every warrantee is charged with the price to the state, and credited as having paid it. Somehow it happened that John Keble's blotters were not considered official books, and copies of them under seal were not received in evidence. In Grant v. Eddy, copies, compared and proved, were received. An application was made to the legislature to declare them, by an act of assembly, office books, and certified copies good evidence. This resulted in the act of the 31st of March 1823, *Purdon* 357, title Evidence. (Qu.—whether it might not be better placed under title Land Office.) Sect. 1. "Copies of all records, documents *and papers*, in the office of the secretary of the commonwealth, secretary of the land office, surveyor-general, auditor-general and state treasurer, when duly certified by the officers of said offices respectively, shall be received in evidence in the several courts of this commonwealth, in all cases where the original records, documents and papers would be admitted in evidence: *Provided,*

[Galbraith v. Detrich.]

*however*, That in any judicial controversy, before any court in this commonwealth, either party may have the original record docu-ment or paper produced on the service of the proper process for the purpose." Now it is notorious that this act, so far as it embraced John Keble's blotters, was intended to admit them solely to show *who actually paid* the money. The ledger always showed that it was paid, but neither when, nor by whom it was paid. Since the passage of this act, this evidence of who paid the money, has been received in all courts, and unless contradicted or explained by show-ing that the person paid it as agent, has decided the point. In only one case was this evidence rejected, and the matter brought into this court. See Oliphant *v.* Finson, 1 *Penn. Rep.* 59; and see, also, Goddard *v.* Glonninger, 5 *Watts* 209.

This act of assembly, and the uniform practice, in courts, of receiving, either, the original receipt, where one was taken, or the extract from John Keble's blotters, as evidence of ownership, shows the understanding, in courts and in the legislature, that the man who paid the purchase-money to the state is the owner of the land. The person who discovered the land to be vacant, and who wrote, or procured to be written, the applications, sold the discovery, not the land, and received a sum in cash, or secured by article of agree-ment or by note, for the discovery. The amount due on these agreements or notes were, in 1796, 1797 and 1798, sued for, and the judgments, amounting to millions of dollars, against Morris, Nicholson, Wilson and others, are all founded on debts of this kind. That these claims, whether founded on articles of agreement for sales of the discovery, or on notes given, were a lien on the land bought from the state and paid for by the purchaser of the disco-very, is a new allegation, not supported by the terms of the agree-ment, the understanding of the parties, nor by legal principles, and contrary to the plain provisions of the acts of April and September 1794, before referred to. It would, at the end of forty-five years, introduce, as evidence of ownership, what at the time was no evi-dence of any such thing—what the legislature, in the two acts above cited, have treated as a nullity. It would do more and worse; it would prove title in those who never had, or claimed or pretended to have, any title to land. Many of the persons who brought to Philadelphia and sold long lists of applications, could not write, at least not legibly, and their lists were made under their direction, by some better penman. Robert Morris, John Nicholson, James Wilson and William Bingham, between the 3d of April 1792 and the 22d of September 1794, paid the state for more than four mil-lions of acres; and probably, nay, I may say certainly, no one of them ever wrote a single application for a tract of land during that period. The same may be said of all the purchasers of discoveries or lists of that day; none of the many buyers of discoveries ever wrote the application he filed, though most of them actually paid the discoverer, and the three first named did so for a great part of

their lands.   Since 1794 up to this day, when a settler applies for his tract, he goes to some man who has a printed form of the application and proof, who writes his application for him.   This new evidence of title, instead of settling titles, will unsettle every thing; and in more than nine hundred and ninety-nine cases of a thousand will lead to a false conclusion.

I have hitherto treated this matter as if there was no proof going to show that B. Galbraith was not the owner, and never claimed to be the owner of these warrants; but there is abundant proof of this.   The copy of the article between Ross and Wilson was in his hands.   If he had claimed the lands, he would, at least as soon as he ceased to be deputy surveyor in 1796, have entered a *caveat* against granting patents on these warrants, and would have notified Judge Wilson of his claim.   If he were the owner, he would have so returned them to the commissioners, instead of saying he received those forty warrants from James Ross; and if he was the owner, no fees were due to him for surveying his own land, and he could not and would not, at the foot of his list to the commissioners, have stated that there was no specific appropriation of these warrants, nor return of them *for want of fees.*   Bartram Galbraith was not much of what is called a land-jobber; he took up a tract of land occasionally; he understood his rights, and did not lightly give them up; if he owned these forty warrants, he would not have returned them as received from James Ross, and concealed his own claim; he would not have stated they were not returned for want of fees, if they had been his own and no fees due; he was both too honest and too proud to put his name to a falsehood, and too wise to put on record what clearly amounts to a disclaimer of any title, if he made claim to any title.   His return was strictly correct; he knew Ross had agreed to sell the lands to Judge Wilson—that Ross, in the first instance, was to pay the cost of surveying and returning, which Wilson was to refund, and also pay one shilling per acre; he knew Wilson was dead and reputed insolvent, and he did not know how the matter would be settled, and says, no doubt, the parties contend with each other.   I then conclude, that although, in the case of applications on which no money was paid, a presumption of ownership might arise from the handwriting, yet we have seen that was overbalanced by even paying cost of surveying or any expenditure of money or labour, yet when the whole purchase-money was paid by a different person from him who wrote the list of description, the title vested and was always held to vest in him who paid the money; and it would be worse than useless to inquire, after death of all the original parties, why one man wrote the applications and another paid the money.   The title vested in him who paid.   But in the present case, B. Galbraith states, officially, that he received these warrants from J. Ross; the same states, officially, that they were not returned for want of fees. Now he would not have stated the first, if he had taken the war-

[Galbraith v. Detrich.]

rants out himself; nor the last, if he had been the owner, for then no fees were due to himself for surveying his own land. Nothing could have been a more explicit disclaimer of ownership than the conduct of B. Galbraith, and his return to the commissioners. The heirs of B. Galbraith never had any right, nor colour of right, to the forty warrants or the lands in question, by reason of them. For it will not, I hope, be said B. Galbraith had any right to the lands because his surveying fees were not paid. And this might make an end of the case, and it might seem immaterial to inquire whether T. Elder ever was counsel for the heirs of Galbraith or not; for if they had not a particle of interest, their right could not be injured by him or any body else; but as the whole stress of the cause was put on this point, I will notice it. The whole of the evidence on which his retainer for the heirs of B. Galbraith is founded, is contained in the deposition of John Foster, which is before set out at length. It will be proper here to notice that, in order to understand it, we must remember what was proved in this case, viz: that David Elder, the brother of Thomas, was married to Elizabeth, a daughter of B. Galbraith, and one of the parties to this suit; that by a proceeding in the orphans' court, the lands of B. Galbraith were taken, on a valuation, by David Elder, who entered into recognizance in a large sum (above 20,000 dollars), to pay their shares to the several heirs. David Elder died about 1809, having appointed Mr Wallace and Mr Allen his executors. To these he gave power to sell all his lands to raise money to pay his debts; and they sold all which had not been sold by him in his lifetime. The payment of their shares to the other heirs, depended on the recovery of the money from the purchasers. Many causes arose why these moneys were not to be speedily collected. And four or five of these suits were tried in a circuit court before me, on all of which appeals were taken to the supreme court, and two of which, viz: Allen *v.* Getz and Sawyer *v.* Allen, are reported in 2 *Penn. Reports.* In the last of these cases we see what the suits with Taylor, mentioned by Gen. Foster, were; and in the whole of them we see at least part of what Mr Elder was employed to do. He tried all those causes for the Galbraith interest, and the Messrs Fisher, or one of them, were for those opposed to the Galbraith estate. Gen. Foster, in the first part of his deposition, states several suits in which Mr Elder was employed by him. He states that Mr Elder and the late Judge Duncan (then at the bar) offered to undertake the management of all the estate of B. Galbraith in Dauphin county; that William Galbraith, who then had in his possession the forty warrants and surveys, refused to employ them; that between 1809 and 1815, Mr Elder frequently spoke of these forty warrants to him. He does not state that he ever spoke to Mr Elder about them; and at the close, when a direct question was put, he says he never did employ him as to these forty warrants, or give him any instructions about them. I am disposed to go as far as any judge in supporting

the sacred character arising from the confidential situation of attorney and client; and I would say that if Mr Elder, though never employed as to these lands, yet in his place as counsel in other matters, acquired any knowledge which he *has used to their injury* and his own gain, he ought not to profit by it.

The counsel of the defendants put two points on this subject to the court, which were answered distinctly as follows :

Point sixth. That if the title of Bartram Galbraith was defective, and Thomas Elder acquired a knowledge of that defect as their counsel, he cannot now take advantage of that defect, to their prejudice.

Answer. If plaintiff, as counsel of defendants, concealed any thing in relation to their title, which it was his duty to communicate, or if he acquired any knowledge of their title or its defects, by means of which he was enabled to acquire a title to the land, he cannot take advantage of a title thus acquired.

Seventh point. That whatever the law in this case might be as to an innocent purchaser, *if the jury believe* the testimony of General John Foster, that, as guardian of the minor children and grandchild, and attorney in fact of the other heirs of Bartram Galbraith, deceased, he employed the plaintiff in this case as the attorney and counsellor to attend to the interests of the heirs generally in all matters relating to the landed estate of their ancestor, in the county of Dauphin, and if, as such attorney, these forty warrants and surveys came to his hands, knowledge and possession, and from them he derived a knowledge of their locality, or any defect in the title to them, and thereby was enabled to gain an interest in the lands contained or embraced in them, not intended by his clients, he cannot avail *himself of such knowledge to the prejudice of his former clients,* and will at law and in equity be considered as their trustee, and must surrender the lands in question to them." To this, the judge says he has answered in his charge; that charge is as follows: " If the plaintiff, in his character as counsel, concealed from his clients, the heirs of Bartram Galbraith, any information which it was his duty to communicate to them, or if he obtained the knowledge of any fact in his character of counsel, by reason of which concealment or knowledge he was enabled afterwards to acquire a title to this land, he cannot avail himself of a title thus acquired. There is, however, nothing in the evidence on this subject, (the employment of plaintiff as their counsel by defendants,) which will entitle defendants to your verdict, in case you should be of opinion that Bartram Galbraith was not the owner of these forty warrants."

In every case, questions of law arise upon facts given in evidence, which facts alone make the question of law material; and here the first inquiry is, was Thomas Elder ever retained, consulted, or intrusted by the Galbraiths, in any way or shape, as to these lands. The expression of Mr Foster, that Mr Elder was spoken

to by him to be counsel for the estate generally, must not mislead us. In other parts of his deposition, and in the other evidence given, we see what that expression meant. Taken alone, the declaration by Foster "I recollect giving my note to Thomas Duncan and Thomas Elder, as a contingent fee for their professional services, to be performed for the estate of Bartram Galbraith, when necessary;" but he adds, no services under that agreement were required or performed. The first part of this sentence, taken alone, I say, might be supposed to relate to these lands; but when we see that the same witness, when Mr Duncan and Elder offered to undertake the management of this claim, that William B. Galbraith rejected their proposal, and Mr Foster himself does not pretend that he himself agreed to their proposal; when he states again that Mr Elder frequently spoke to Mr Foster about these warrants, between 1809 and 1815, but no intimation that Mr Foster ever spoke to Mr Elder, and when he concludes by stating that he did not employ Mr Elder as to these warrants, I cannot see on what the allegation of the relation of client and attorney is founded. Who employed him? Neither Wm Galbraith, who refused to employ him and Mr Duncan (and I will say no two men were more likely to make their claim available, if possible); Mr Foster swears he did not employ him as to these warrants. But it was insisted he must have been employed, for he had these forty warrants once in his hands; and how did he get them, unless as their counsel? When it is remembered that his brother took, at an appraisement, all the estate which B. Galbraith left in Dauphin county—that his brother died soon after—that disputes and suits arose between his brother's executors and adverse claimants—and between them and purchasers—and between them and the other heirs of B. Galbraith—it is possible that his brother's executors did as Mr Foster, the guardian of some minors, did: that they made search for papers left by the deceased, and that they brought and gave to their counsel some papers, with which neither they nor he had any business, and which were of no use to them or him; and it is possible this was the reason why he mentioned them to Mr Foster, and at once gave them to William Galbraith, when he asked for them. Certainly there was no positive evidence that ever he was retained by the Galbraiths as to these lands, and when the court left it to the jury to find whether he ever was retained, they did all they could do—they did all they were asked to do. The counsel of the Galbraiths begin their proposition with the words "if the jury believe," and again, "if as such attorney he derived a knowledge of any defect in their title to them, and thereby was enabled to gain an interest," &c. &c. The whole opinion of the court on this point, is as clearly and strongly expressed as they did or could ask it, and if there was any error, it was in the finding of the jury—and we cannot correct that. But there was no error in the jury. If I am right, that the heirs of Galbraith had no scintilla of interest, nothing done by Mr Elder could injure them. Mr Elder

[Galbraith v. Detrich.]

saw the warrants—perhaps he saw the drafts—perhaps he had
learned that B. Galbraith wrote the applications, and never having
been employed to investigate the matter supposed they had some
claim.   He offered to investigate it.   They refuse, and take from
him what papers he had.   They employ other counsel, and fail,
and abandon the matter for thirteen years more, in all for thirty-
three years.   They then renew their claim, and show clearly and
unquestionably, that they never had any claim, that the land at
one time belonged to J. Ross and Judge Wilson—that B. Galbraith
knew this, and in an official return to the commissioners stated this,
and disclaimed all interest as unequivocally as it could be done.   The
court might and ought to have told the jury that, admitting all they
proved, and all they alleged, there could not be a verdict for the
Galbraiths, unless they are the heirs of Ross and Wilson, or had
shown some right to stand in the place of these men.   I cannot see
that they showed any right to appropriate to themselves what Ross
and Wilson had abandoned.

I have said if Mr Elder, while concerned in other cases, acquired
a knowledge of the Galbraith title, and concealed that knowledge
from them, and afterwards used it to their loss and his own gain,
he cannot profit by it.   And this is going farther than any case I
have seen, and perhaps further than on full consideration and dis-
cussion I would go; but suppose such to be the law, how far is it
to go? To what length of time must it extend? How precise must
be the information?   Every case must depend on its own circum-
stances.   But in the present case he acquired no information from
seeing one part alone; he possibly was led to suppose the Gal-
braiths had some claim to these lands.   They have themselves
shown they had none, for it was they who showed that Judge Wil-
son paid for them and owned them.   The whole argument of the
counsel of the defendants is founded on the assumption that they
owned their forty warrants, and that they by procuring returns of
survey would have become owners of the land; now they had no
more right to those warrants than Mr Elder had, or than I have—
and nothing but a purchase of the interest of Ross and Wilson
could have given them any right to them.   Admit all they asked,
and all I have said I felt disposed to decide on ground of general
policy, or special policy; admit to the fullest extent that he in
whom confidence has been placed shall not abuse that confidence,
so as to injure those who confided, how can it apply to a case
where the client had no scintilla of interest; to a case where the
client and the counsel too were under an entire mistake.   Suppose
a counsel sees that the ancestor of his client had proposed to pur-
chase lands, and the client and counsel suppose the purchase may
still be completed—but suppose the clients tell the counsel we will
not employ you in this business, and thirteen years after the coun-
sel buys these lands, and his clients allege he has injured them;
and suppose they or he show that the ancestor gave up all idea of

VIII.—L

purchasing; that he knew others purchased and paid for them, and that so far from objecting, the ancestor had acted as agent of the seller; had seen the agreement between the purchasers, showing their respective interests; had officially notified that he had no claim except to pay for measuring them, what injury has the counsel in such case done to his clients? It turns out they had no title. It is admitted they have no title. They then are not injured, and the counsel has not gained by their loss. And I can see no principle of general or special policy, or of justice or of reason, which can take from a man what he has bought and paid for, to give it to those who never had any interest in it, merely because they once thought they had an interest, though they themselves show they had none; and because the man who has bought it was once their counsel in other matters, and perhaps not having investigated their title, at one time thought they might possibly have some colour of title. I repeat again that the counsel of the defendants asked of the court to submit this matter to the jury, and it was so submitted, and the jury have passed upon it, and rightly in my opinion; but whether right or wrong, this court have no power over it.

As I understand it, the whole court are of opinion this case does not come within the provisions of the 11th section of the law of the 3d of April 1792, because the board of property have no power to rescind a patent. 7 *Serg. & Rawle* 146.

If they could, the confusion introduced into our titles would be incalculable; one board can grant a patent, or the officers where no *caveat*, can do so, and are bound to do so, on compliance with the provisions of the law. In Hubley's Lessee *v.* White, (generally cited as Hubley *v.* Chew,) Yeates and Smith decided that this section did not apply where the titles commenced before the 3d of April 1792. Grants *v.* Eddy, 2 *Yeates* 148, was, in fact, brought on a decision of the board. But as Grant, who had contracted to sell to Nicholson and Hollenback, had agreed to sell to Wilson, were anxious for a decision, and the latter procured Daniel Eddy to go on the lands that an ejectment might be served on him, nothing was said about the application of this section. The decision, however, was not considered final, for more than one suit as to the right to part of the lands then in dispute, has been tried in our own courts, and at least one ejectment in the circuit court of the United States. Willirick and Others *v.* Morris and Nicholson, 3 *Yeates* 104, was also brought within six months after a decision of the board of property, but not a word was said about the construction of this act; each party wished a decision. I was concerned as counsel in the trial in Lycoming. In Boggs and Miles (not reported, but in which I was counsel) tried before Chief Justice Tilghman at the first circuit court in Center county, he decided that the act did not apply where the title of one of the parties was dated before the enactment of that law, and Boggs who was plaintiff then in possession, proceeded no further, but became nonsuit. Miles brought no suit against him, and others under him hold the land yet.

[Galbraith v. Detrich.]

In that case, the point was distinctly made and argued by the late Mr Duncan, that this section did not apply and was never intended to apply, to any lands except those north and west of Ohio and Allegheny. The chief justice decided the other point, but declined even intimating an opinion on the last point. I have thought much on the subject, and pass it as the late chief justice did, because it is not material in this case, and was not argued. The judge said, considering this as a case under the 11th section of the act of 1792, that the jury if they found title in a third person, could not give a verdict for defendants below; and surely if it was a proceeding under that section, he was right; for if the defendants showed a valid outstanding title in a third person, the board of property could not award a patent to defendants. This could never be the law, as the parties agreed to try the case as coming within that section, (and I suppose this court will so hold, for they have, though without argument, directed that section to apply to lands east of Allegheny,) we ought to review it as it was considered by both parties. Either under that section or in a common case, if defendant shelters himself under title in a third person, it must be a valid subsisting title, not a derelict abandoned one. And unless we are prepared to overrule a succession of cases from Mifflin and Chambers, down to the present causes, the title of Wilson was lost by delay and total abandonment. Neither he nor any of his heirs or legal representatives, nor those of James Ross, have done any act since procuring the surveys. The surveys were not returned, because the fees were not paid, and after a delay from 1795 till 1827, '28, and '29, a period of thirty years, if Mr. Elder or any other person could not obtain these lands by purchase from the state, then he who refused to complete his title is better off than if he had completed it. The man who has his warrant returned, and never looks after it for more than twenty-one years, and never pays taxes, is to be considered as abandoning it. See McCall *v.* Seely, 3 *Watts.* There is great fallacy in at one time considering the Galbraiths as owners, and their acts as the acts of the owners; and the next minute arguing that what was said to be their title, was an outstanding title in Wilson. But if the title was in them they did not pursue it; if the board of property decided wrongly, which as the law then stood, and as the case was brought before them, I do not admit, yet they could have taken possession, could have returned the lands as their property to the commissioners, and paid taxes on them. There was a new board of property in 1818, under governor Finley, another three years after under governor Heister, another under governor Shulze, but nothing was done or said after 1816; and I repeat, unless we are prepared to overrule all the decisions on this subject for the last ten years, the land was open to be taken up by any person. Something was said of the difference between a warrant and location as to the effect of

[Galbraith v. Detrich.]

.laches, but we will find the cases, at least the old cases, make no difference. In Drinker *v.* Holliday, 2 *Yeates* 88, Judges Shippen and Smith expressly put them on the same ground, and from that to McCall *v.* Seely, 3 *Watts.* I know of no case, and none was cited making a difference, and many which make no difference. Nisbet *v.* Titus, 1 *Yeates* 286; Lawman *v.* Thomas, 4 *Bin.* 58; Moore *v.* Sheffer, 6 *Serg. & Rawle* 130, and what has always been considered a leading case. 2 Smith's Laws, note 190, position 4. That a settler, or one taking a new warrant, knew of an earlier one not returned for fifteen years, does not affect such settler or second warrantee. 4 *Serg. & Rawle* 473.

As, in my opinion, the points I have discussed make an end of the cause, I might here cease; but some bills of exceptions to evidence were taken, many of which were waived on the argument here. I shall notice such as are assigned for error.

The first and second bills are the same, viz: rejecting surveys and returns since the institution of this suit. It may be observed, that the general draft was afterwards received—the separate surveys were not. That no title acquired since suit brought can be given in evidence, I thought a universal rule in ejectment; but it was expressly decided that the evidence was an act of the board of property in Hubley *v.* White, 3 *Yeates* 133, and see cases there cited.

The third bill, I think, was abandoned. Generally, how can the fact that a man mortgages certain lands, be evidence that he does not claim any other lands in the same county? But in this case, James Wilson had not made his contract for the forty warrants in question, until September 1794, and the mortgage is dated on the 5th of August preceding. Surely this had no tendency to prove a non-claim of what he had not then bought.

The fourth bill of exceptions was not taken by defendants below, and must have been inserted in this first error by mistake.

The fifth bill of exceptions relates to the admission of the deposition of Bird Wilson, proving the article of agreement between James Ross and James Wilson; and the deposition of John Watson, proving the handwriting of B. Galbraith on a copy of this article. The first was clearly evidence to show how it was that J. Wilson paid for these warrants, and that it was on a contract with J. Ross, and not on any parol or other agreement with B. Galbraith; and the latter was evidence to show that B. Galbraith knew of this agreement before he made his return to the commissioners of these lands.

The sixth bill was to the admission of the records of the orphans' court, to show what suits Foster employed Elder to attend to. Foster's deposition was vague as to this. This record was good, as explanatory and rebutting; although assigned as error, it was passed in the argument. It was evidence also to show that Galbraith's heirs did not claim these lands at that time.

[Galbraith v. Detrich.]

The seventh bill is about a matter immaterial; it could not have appeared, except in a case where it had been resolved to take a bill of exceptions to every tittle of testimony offered.

There is nothing in the eighth and ninth bills; the evidence was clearly admissible.

The tenth bill is to the rejection, a second time, of the mortgage of the seventy-three tracts bought of Hiester on the 5th of August 1794, before Wilson had paid any money on these forty, or had any interest in them; it was properly rejected, as not tending to show any thing.

The eleventh bill is the same offer, together with parol proof that Bartram Galbraith, while making a general draft, said he owned these forty warrants—that Wilson was to give them in payment for surveying fees. If there is any thing settled on principle and by decision, it is, that a man shall not make a title in himself by his own declarations, especially in opposition to written evidence of title in another.

The twelfth is to show a commissioners' sale of these lands by commissioners' sale book. I have remarked on this before. Besides, the sale book alone was no evidence of any thing.

The thirteenth is an offer of Galbraith's field book, to prove he paid the hands who assisted to make the survey. Entries of accounts in a book, of money paid for Ross and Wilson, is no evidence against them. It is at best parol, and parol declaration of a surveyor, in absence of parties, is not evidence; 1 *Yeates* 151; 2 *Yeates* 133.

I have thus partially gone over all the points on which, on the fullest deliberation, I consider this cause must turn, and, in my opinion, the judgment ought to be affirmed.

Judgment reversed, and a *venire de novo* awarded.