IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

## MIDDLE DISTRICT—HARRISBURG 1856.

### Fox *versus* Lyon.

A descriptive warrant, followed in a reasonable time by a survey and return, gives title from its date.

It is against the statute and the usages of the Land Office, to deliver a warrant until the purchase-money has been paid.

The title under a descriptive warrant executed in such reasonable time, after twenty-one years, cannot be set aside, in favour of a junior warrant, by parol proof that the purchase-money was not actually paid at the time the warrant bears date.

After twenty-one years, the record will be conclusively presumed to contain the truth.

The "Blotters" found in the Land Office are not the records of any public transaction, but private memoranda kept for the convenience of the officers, and are admitted after the death of the party who made them as evidence, on the same principle of private entries of other deceased persons.

Such evidence is not of as high a grade as the oath of a living witness, and is only received *ex necessitate rei*, after all other evidence is supposed to be extinct.

A court of error presumes all facts to be in favour of a party against whom a cause has been ruled on a point of law.

ERROR to the Common Pleas of *Centre county*.

This was an action of ejectment brought by James Fox and Richard Fox, to recover eight hundred acres of land in Taylor township, Centre county. The plaintiffs claimed title under two warrants, surveys, and patents. One to John Fox, Sr., dated the 14th January, 1794, for "400 acres of land in Bald Eagle Valley, and adjoining a survey in the name of Mordecai Massy, on the south, and adjoining lands of Fowler & Co., in Franklin township, in the county of Huntingdon." On the same day a warrant to James Fox for "400 acres of land adjoining lands this day granted to John Fox, Sr., on the north, in Franklin township, in

(9)

the county of Huntingdon." The applications for these warrants were filed the 16th December, 1793. Both tracts were surveyed on the 16th May, 1795, and returned to the Surveyor-General's Office the 12th March, 1799. Patents were issued to the warrantees respectively on the 25th July, 1799. The patentees are both dead, and the plaintiffs showed that the original title, or the major part of it, was vested in them.

The defendants, to maintain the issue on their part, gave in evidence warrants to Robert McGhee, Peter Loudon, John Harrison, and John Loudon, all dated the 13th March, 1794, and called the "Morgan Warrants." The surveys on these warrants were made the 10th and 11th June, 1794, and returned on the 29th April, 1795. They also gave in evidence a warrant to George F. Alberti, dated 8th September, 1794, a survey made thereon on the 30th April, 1795, and returned into the Surveyor-General's Office on the 29th January, 1796. The title to these warrants and surveys were in the defendants. They also showed warrants and surveys to Baldwin and Downing, in 1784 and 1785; but these surveys do not appear to embrace the lands in controversy. The defendants further gave in evidence a warrant to Andrew Berryhill, dated 5th July, 1829, and surveyed on the 22d of the same month, and a deed from Andrew Berryhill to themselves. The taxes had been paid on the John and James Fox warrants, and on the G. F. Alberti and Andrew Berryhill tracts.

The Morgan and the Alberti surveys cover all the land in dispute; being the whole of the John and James Fox surveys.

The "Old Purchase Blotter," No. 5, kept by John Keble, contains this entry:

"1794. June 13. No. 12,889. J. Fox, two warrants for 800 acres, at 50 shillings. Fees paid.

"Paid in specie, £20. Fees, 10 shillings, paid."

The same book showed that the purchase-money for the Morgan warrants was paid on the 11th April, 1794, and for the Alberti warrant, 9th September, 1794.

The defendants contended that although the Fox warrants were prior in date to the warrants under which they claimed, yet that a warrant only gives an inceptive title from the payment of the purchase-money; and that in this case, before the purchase-money was paid on plaintiffs' warrants, the Morgan warrants issued, the purchase-money was paid, and surveys made upon them: and that these facts would postpone the Fox titles.

The court below (BURNSIDE, P. J.) charged the jury as follows:—

"A point has been made on the argument of this cause by the counsel for the defendants, to which at first we were not disposed to give much consideration, but, on reflection, we are satisfied that it should rule the case.

[Fox *v.* Lyon.]

"The plaintiffs derive title from the Commonwealth by warrants of the 14th of January, 1794, which (if you could find in the evidence) was located by its calls, we would hold to be descriptive warrants. Their surveys were made on the 16th of May, 1795, and patents issued July 25, 1799.

"The defendants have shown various titles to the whole and parts of the land contained within the lines of the plaintiffs' surveys. Their Morgan title includes all the claims of the plaintiffs. The Morgan title commences with various warrants of the 12th of March, 1794, and surveys of the 10th and 11th of June, 1794. But they also showed that the purchase-money for the warrants, under which the plaintiffs claim, was not paid until the 13th of June, 1794—some two or three days after their surveys were made.

"In Barton *v.* Smith, 1 *Rawle* 403, the Supreme Court decided that a survey made previously to a warrant is void, and is not rendered valid by the receipt of the purchase-money, and acceptance of the survey.

"The late Justice HUSTON (and I am certain every lawyer acquainted with land titles will concur with me in saying that no man in the profession was his superior in the land laws of Pennsylvania, or more intimately acquainted with the usages of the Land Office), in his Treatise on Land Titles in Pennsylvania, page 223, says: 'On the 1st of September, 1769, applications as such ceased, and applications on which warrants were to be issued were received, and warrants issued thereon; and this continued until the Proprietary Government ceased. Among the strange things which I have met with in my researches for this work, one, and not the least remarkable, is, that I have not been able to find in the books of the Land Office an entry of any regular order for this change; but a change there was certainly made, not in the price of the lands, but in the evidence of right, as known by that office. All titles made after the 1st of September, 1769, were *on warrants*, not applications alone. The four (see page 322) were the only exceptions. The officers of the Land Office have repeatedly assisted me in searching for such an order, and have found none. *I have reason to believe, and do believe, that after the 1st of September, 1769, no warrant was sent to a deputy surveyor, until the purchase-money had been paid. The warrant, when made out, was dated on the day the application for it was made, although the warrant itself was not filled up, and signed, and sealed until the money was paid into the Receiver General's Office.*'

"And he adds: ' *What adds to my conviction that such was the case is, that after the Revolution, and under the State, that the warrant always bore the date of the application, although the money was not paid, and the warrant sealed and delivered for months, or in some cases years, after the date of the application.*'

[Fox *v.* Lyon.]

"And Judge Jones, on page 27 of his neat, correct, and perspicuous work on our Land Titles, says: 'After that year (1769) warrants were paid for in full before they were issued.'

"Beside this usage of the Land Office, we have the Act of the 21st December, 1784, in the sixth section of which it is, among other things, provided: 'And every applicant for any of the same lands shall, before the warrant for the same issue, produce to the secretary of the Land Office an acquittance, signed by the receiver-general of the said Land Office, setting forth that the full purchase and consideration aforesaid has been paid and satisfied.'

"Now, the purchase-money required by law, as well as the usage of the Land Office, to be paid before warrants could be issued, was not paid by the plaintiffs or those under whom they claim until after the surveys of the defendants were actually made on the ground.

"If an individual makes an application for a warrant, and delays taking it out, so far as the State and the individual is concerned it is a matter of little or no importance. But if a third person applies for the land, takes out his warrant, pays his purchase-money, and has his survey made before the prior applicant takes any other than the incipient steps, we apprehend that the second applicant has equal equity with the first: and if he does all the law requires of him, the equity of the first applicant is defeated, and is postponed to the rights of him who has paid the Commonwealth his purchase-money, and thus acquired a legal title to the land.

"Entertaining these views, we instruct you to find a verdict for the defendants."

The jury accordingly found for the defendants.

These instructions were assigned here for error.

*Linn, Curtin,* and *Blanchard,* for plaintiffs in error.—The principle decided in Barton *v.* Smith, 1 *R.* 403, does not appear to us to touch the point in this case, that a descriptive warrant confers no title till the purchase-money is paid. That case ruled that a survey made previous to a warrant is void, and the acceptance of the survey does not estop the Commonwealth or its grantee from taking advantage of the irregularity. Since the revolution it has been the uniform practice to issue no warrant till the purchase-money is paid.

The question which lies at the threshold of our inquiry, we humbly conceive to be, whether under the Acts of Assembly regulating the sale of lands by the Commonwealth, a descriptive application is the inception of a right which if pursued with reasonable diligence will give title to the applicant from its date? Although there are some dicta in the opinions of Judge HUSTON, which he has trans-

[Fox *v.* Lyon.]

ferred to the pages of his Treatise on Land Titles in Pennsylvania, that would seem to favour the negative of this question, yet we humbly conceive that the language of the Acts of Assembly on the subject, the decided weight of judicial opinion, the practice and usages of the Land Office, and the general understanding of the profession, all unite in the support of the affirmative.

By the terms of the 25th section of the Act of the 8th of April, 1785, all applications received within the first ten days after the opening of the Land Office for the purchase of 1784, were to be determined by a lottery, and the warrants to have a priority accordingly, "and all applications to the said Land Office which shall be made after the expiration of the said ten days, shall have *priority* according to the order in which they shall severally come to the hands of 'the said secretary, and shall be numbered accordingly, and not otherwise; and all warrants for lands within the said late purchase, as well as those the priority of which shall depend upon the said lottery as others, shall be *made out in their proper order* as aforesaid upon the payment of the legal fees by the person who shall produce the acquittance of the said receiver-general for the purchase-money, *as soon as conveniently may be without needless delay and without partiality.*"

And by the 20th section of the Act of the 22d of September, 1794, "all applications made since the 1st of April, 1784, on the files or the books of the Land Office for which the purchase-money has not been paid, *shall, from and after the passage of this Act, be null and void.*"

These Acts would seem clearly to recognise the right of the applicant to perfect his title within a reasonable time. Why render void all applications on file at a certain period, if they were a nullity from the beginning? In the case of Grant *v.* Eddy, 2 *Yeates* 148, a prior application was held to give a certain equity, unless the applicant was guilty of gross negligence. Mix *v.* Smith, 7 *Barr* 75; 10 *Watts* 75, 76; Galloway *v.* Ogle, 1 *P. C. C. Rep.* 298. There is no reported case which conflicts with Grant *v.* Eddy, and it accords with the general understanding of the profession. A descriptive warrant gives title from its date, and interest is charged from the *date* of the warrant. If the payment of purchase-money be a controlling fact, the Court should have left it to the jury to decide when it was paid, as was done in the case of Barton *v.* Smith. In the absence of proof to the contrary, the purchase-money is presumed to have been paid at the date of the warrant. And it should have been left to the jury to say whether the entry in the Purchase Blotter referred to these tracts. They are not evidence of the time of payment, as against a purchaser, where they differ from the date of the warrant.

*McAllister* and *Hale*, for the defendants in error.—The Morgan

[Fox *v.* Lyon.]

and Alberti surveys were both made and returned prior to the surveys and returns under the Fox warrants. Without more, therefore, they would take precedence of the Fox title. But the plaintiffs allege that the Fox warrants are descriptive and give title from their date. But it appears distinctly that they are not located according to their calls.

But it also appeared that the Morgan warrants had been located upon the ground prior to the payment of the purchase-money on the Fox warrants, and consequently before *they issued*. Because, although dated when the application was filed, the warrant could not legally, and did not actually issue until the purchase-money was paid. There was therefore no contradictory evidence to be submitted to the jury.

But it is argued that a " descriptive application is the inception of a right, which, if pursued with reasonable diligence, will give title to the applicant from its date."

It would take the profession by surprise to hold that the mere making and filing of an application should vest a pre-emption right in the applicant, and estop the Commonwealth from disposing of her lands. If a delay of months does not forfeit the right, a delay of years would be insufficient. It did not bind the applicant to take and pay for the land. Why should it bind the State to keep it for him? Upon what principle of equity is one bound while the other is not? It has no place except as between rival applications for unappropriated land. There priority of application determines the right to a warrant. But it has no place where another has procured a warrant and paid for it while the prior application is lying dormant.

The case of Mix *v.* Smith, upon which plaintiffs rely, rules that even an *improvement* commenced *after* an application for a warrant, and without actual knowledge of it, would take precedence of the warrant; but that it would not do so if made *surreptitiously,* and in 10 *Watts* 75 and 76, cited also by the plaintiffs, it is distinctly stated by the court that " since the opening of the Land Office after the Revolutionary War, no warrant could legally issue until after the purchase-money to the State was paid." It is therefore that the production of the warrant is *primâ facie* evidence that the purchase-money has been paid to the State—*when paid* is seldom inquired of, being of no consequence between the warrant-holder and the State. It is however conceded by all the cases, and among them the case of Grant and Eddy, so much relied upon by the plaintiffs, that as all warrants bear equal date with the filing of the applications, *when* they actually issued, can only be ascertained from the *date of the payment of the purchase-money*. This we have shown, and have thereby shown that the warrants to John and James Fox were not actually issued until after the surveys

[Fox *v.* Lyon.]

under the Morgan warrants had been executed upon the land in dispute.

The opinion of the court was delivered by

BLACK, J.—We are bound to assume that the warrants under which the plaintiffs claim the land in dispute, are descriptive, because the jury were not permitted to pass upon the question, though there was evidence tending to establish the affirmative of it. A court of error presumes all facts to be in favour of the party against whom a cause is ruled on a point of law. If the plaintiffs could recover, supposing their warrant to be descriptive, they have a right to a new trial, to see whether a jury will not say that it is what they assert.

The warrants of the plaintiffs therefore were descriptive. They bear an earlier date than those under which the defendants claim, or any others that were ever issued for the same land. They appear to have been followed up with no lack of diligence, for they were made and returned within a year and a half. It is an undisputed rule of law that a descriptive warrant thus followed by a survey and return gives title from its date. Why then should the plaintiffs not recover?

The defendants answer this question by saying that in law a warrant is no warrant at all until the purchase-money is paid to the Commonwealth, and that in point of fact, the purchase-money on these warrants of the plaintiffs was not paid until after the warrants under which they (the defendants) claim had been issued and paid for, and surveys under them were made and returned. The argument in substance is, that different warrants for the same land take priority, not according to the dates of the warrants themselves, but according to the times at which they were paid for; and it is contended that the plaintiffs' warrants, though apparently the oldest, are in truth the youngest; because it is proved that the purchase-money upon them was paid last. The court below, adopting this view of the subject, directed a verdict for the defendants.

It must be remembered that the plaintiffs' title is, on the face of it, the elder of the two. They prove its priority by the records of the Land Office. If those records, which were made and kept, "not for a day, but for all time," as perpetual memorials of the truth, can be relied on, they give the plaintiffs a right perfectly indefeasible to the land described by them. On the other hand, the defendants would establish *their* priority by proof of an extrinsic fact, which is not a part of either title, and which rests merely in parol. The blotters found in the Land Office are not the records of any public transaction. They are private memoranda kept by a clerk for his own convenience, and that of other officers, in settling their accounts with the government and with one

[Fox *v.* Lyon.]

another.  But after the death of the person who made them, they were received as evidence on a principle which would admit the private entries of other deceased persons.  Their general accuracy is not doubted, but they are open to contradiction, and have been contradicted very often.  The written declaration of John Keble that he received the purchase-money on a particular warrant at a certain time, though it was against his interest to make such a declaration, is not better evidence of the fact than the oath of a living witness who saw the money paid.  Indeed it is not evidence of so high a grade, for it is only received *ex necessitate rei* after all other evidence is supposed to be extinct: Strimpfler *v.* Roberts, 6 *Harris* 297 ; Galbraith *v.* Deitrich, 8 *Watts* 112.

These books have been uniformly received in evidence to show *by whom* the purchase-money was paid, in order to raise a resulting trust in favour of the party paying it, just as any other species of parol evidence would be received for the same purpose.  A person who has paid for land, and permitted the title to be made in the name of another, may always prove the truth, not as destroying the legal title, but as showing that in equity it is held by the legal owner for his use.  But how the owner of another title, under a younger warrant, can be permitted to contradict the record of an older title, and extinguish it altogether by parol evidence, is not at all clear to our minds.  It certainly would seem like a violation of a fundamental rule.  In Barton *v.* Smith, 1 *Rawle* 403, the survey was held to be void, because it was made before the warrant came to the hands of the deputy surveyor. But how the fact was established that the survey preceded the delivery of the warrant does not appear in the report of the case. In this court it was taken as settled, because the jury had found it.  It was most probably inferred from the blotter, and the right to show it in that way was not contested.  At all events the point was not raised here.  That case cannot, therefore, be considered as authority for the doctrine that a record, which constitutes part of a title, may be contradicted by parol.

We are not now called on to say whether or not such evidence would be admissible in a case where the facts are recent.  It is undoubtedly against the statute, as well as the usages of the Land Office, to deliver a warrant before payment of the purchase-money. That much should be conceded, because it ·is the law.  Let it be further conceded for the sake of the argument, that a warrant which declares the purchase-money to have been paid at its date, may be contradicted by parol evidence showing that it was not paid until a later period; suppose it also to be true that such parol evidence, if adduced within a reasonable time, would postpone the commencement of the title to the date of the payment: still it does not follow that we must allow a title, good on its face, to be destroyed and set aside by parol evidence of an extrinsic

[Fox *v.* Lyon.]

fact sixty years old. If this was a defect in the plaintiffs' title, lapse of time has completely cured it. A party who has parol evidence in his hands or within his reach, by which he can overthrow a title, must produce it before the time has gone by when the explanation, which might probably have been given while the facts were fresh, has become impossible. After twenty-one years we will take the record and the deeds for what they seem to be. See 6 *Harris* 297.

The most important duty of the judiciary is to make the titles to real estate as certain as possible; so that every prudent and intelligent man may know what his rights are. We simplify them by excluding parol evidence in almost every case. After twenty-one years we refuse to hear such evidence, even for the purpose of showing a fraud.

The successive owners of the warrants under which the plaintiffs claim, bought and sold them no doubt with a conviction that they were the best and oldest title to the land. They cannot be supposed to have known that the purchase-money was not paid when the warrant was issued, or that it was issued at a time subsequent to its date. They were not bound to hunt up the blotters and see what Keble had said about it in his lifetime. On the other hand, if the owners of the adverse title did not know of the fact on which they now base their claim to priority, then they must have bought in the belief that their title was worthless, and paid for it accordingly. If they did know the fact, it was unpardonable negligence to wait for three generations before they asserted their claim.

The point we have discussed, was the one on which the whole case turned in the Common Pleas. It is very fully and clearly presented for our consideration in the assignments of error, and was argued ably and elaborately on both sides. It seems to have absorbed the whole attention of the counsel here, as it did that of the court below. None of the other errors are assigned according to the rule; and they are so set forth that we find great difficulty in understanding them. We think it best, under these circumstances, to intimate no opinion about them.

Judgment reversed and *venire facias de novo* awarded.